J-A25024-16

2017 PA Super 44

| | |
|---|---|
| AUGUSTUS FELECCIA AND JUSTIN T. RESCH, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| LACKAWANNA COLLEGE A/K/A LACKAWANNA JUNIOR COLLEGE, KIM A. MECCA, MARK D. DUDA, WILLIAM E. REISS, DANIEL A. LAMAGNA, KAITLIN M. COYNE AND ALEXIS D. BONISESE, | |
| Appellees | No. 385 MDA 2016 |

Appeal from the Judgment Entered February 2, 2016
In the Court of Common Pleas of Lackawanna County
Civil Division at No(s): 12-CV-1960

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, J., and STEVENS, P.J.E.[*]

OPINION BY SHOGAN, J.:                    **FILED FEBRUARY 24, 2017**

Student athletes Augustus Feleccia ("Gus") and Justin T. Resch ("Justin") appeal from the entry of summary judgment in favor of Lackawanna College a/k/a Lackawanna Junior College ("the College"), Athletic Director Kim A. Mecca ("AD Mecca"), Mark D. Duda ("Coach Duda"), William E. Reiss ("Coach Reiss"), Daniel A. Lamagna ("Coach Lamagna"), Kaitlin M. Coyne, and Alexis D. Bonisese (collectively "Lackawanna").

---

[*]  Former Justice specially assigned to the Superior Court.

Because genuine issues of material fact remain for resolution by a jury, we reverse the entry of summary judgment and remand for trial.

This case involves personal injuries suffered by Gus and Justin on March 29, 2010, while they were participating in a tackling drill during the first day of spring contact football practice at the College. Complaint, 5/4/12, at ¶¶ 46, 48, 49, 65, 72, 76. The College is a non-profit junior college in northeastern Pennsylvania and a member of the National Junior College Athletic Association ("NJCAA"). *Id.* at ¶¶ 3, 18. Traditionally, the College employed two athletic trainers to support the football program. In June and July of 2009, respectively, athletic trainers Daniel Dolphin and Scott Summers tendered their resignations to the College. Answer to Motion for Summary Judgment, 10/16/15, at Exhibits 29 (AD Mecca Deposition, 1/14/14, at 100), 52, 56. When AD Mecca[1] advertised the job openings, Ms. Coyne and Ms. Bonisese applied for the positions. Answer to Motion for Summary Judgment, 10/16/15, at Exhibits 32 (Coyne Deposition, 12/9/14,

_____

[1] AD Mecca was hired by the College on September 17, 1999, as a part-time Alumni Relations Coordinator. AD Mecca's Responses to Plaintiffs' Request for Admissions, 7/25/14, at Response 1. Raymond S. Angeli, President of the College, appointed AD Mecca as the full-time Director of Intramurals and Assistant Athletic Director on May 31, 2006; she accepted the position on June 1, 2006. *Id.* at Responses 2, 3. Shortly thereafter, when the College's athletic director resigned, AD Mecca was offered the position and accepted it on July 1, 2006. *Id.* at Responses 4, 5; Answer to Motion for Summary Judgment, 10/16/15, at Exhibit 29 (AD Mecca at 10). AD Mecca's experience included running a golf tournament for ten years and coaching one year of college softball. Answer to Motion for Summary Judgment, 10/16/15, at Exhibit 29 (AD Mecca Deposition at 11, 12, 17).

at 147), 33 (Bonisese Deposition, 12/3/14, at 27), 59, 62. Following phone interviews with Ms. Coyne and Ms. Bonisese conducted by AD Mecca, the College hired them in August of 2009. Answer to Motion for Summary Judgment, 10/20/15, at Exhibits 58, 61. Ms. Coyne and Ms. Bonisese were hired "with the intent to have them serve as Certified Athletic Trainers." Lackawanna's Brief at 5. Upon hiring, Ms. Coyne and Ms. Bonisese each signed an athletic-trainer job description. *Id.* at Exhibits 60, 63.

Although they had earned their Bachelor of Science degrees in athletic training in the spring of 2009 from Marywood College, neither Ms. Coyne nor Ms. Bonisese was certified or licensed at any time relevant to the underlying action. Answer to Motion for Summary Judgment, 10/16/15, at Exhibits 32 (Coyne at 11–12) and 33 (Bonisese at 10, 55). In August of 2009, Ms. Coyne and Ms. Bonisese learned that they had not passed the Board of Certification, Inc. ("BOC") examination, and they informed AD Mecca. *Id.* at Exhibit 32 (Coyne at 55) and 33 (Bonisese at 16, 53–54).[2] In response, AD Mecca retitled Ms. Coyne and Ms. Bonisese as "First Responders." *Id.* at Exhibits 32 (Coyne at 55–56), 33 (Bonisese at 30, 110), and 70. Upon being retitled as first responders, neither Ms. Coyne nor Ms. Bonisese

---

[2] Ms. Coyne and Ms. Bonisese eventually passed the BOC examination. The Commonwealth of Pennsylvania issued each of them a license to practice as an athletic trainer on July 30, 2010, and September 14, 2010, respectively. Answer to Motion for Summary Judgment, 10/16/15, at Exhibits 32 (Coyne at 86), 33 (Bonisese at 16), and 71.

completed a new or amended job description, despite the inaccuracy about their qualifications on the original job description. *Id.* at Exhibit 32 (Coyne at 55–56) and 33 (Bonisese at 53). In September of 2009, the College hired a certified part-time trainer, Maureen Burke, but she did not attend football practices during the 2009–2010 academic year. *Id.* at Exhibits 32 (Coyne at 44), 64. All three women's job descriptions were identical. *Id.* at Exhibits 60, 63, 64.

In September of 2009, Shelby Yeager, a former professor of Ms. Coyne and Ms. Bonisese at Marywood College, expressed her concern to Ms. Coyne that Ms. Coyne and Ms. Bonisese were impermissibly providing athletic training services. Answer to Motion for Summary Judgment, 10/16/15, at Exhibits 32 (Coyne at 149–151), 67. In an affidavit, Ms. Yeager stated that Ms. Coyne was "ill-equipped to handle the rigors of a contact sport (like football) as an athletic trainer on her own regardless of whether she managed to pass [the certification] exam and obtain her state license." *Id.* at Exhibit 69 (Yeager Affidavit, 9/29/15 at ¶¶ 13, 16–19, 28–31). AD Mecca learned of Ms. Yeager's concerns regarding the qualifications of Ms. Coyne and Ms. Bonisese. *Id.* at Exhibit 68 (Email from Ms. Coyne to AD Mecca forwarding email from Chris O'Brien: Hey, Chris!, 9/2/09). Similarly, Bryan Laurie, head athletic trainer at SUNY New Paltz, provided an affidavit. Therein he stated that he had supervised Ms. Bonisese as a student, that her performance was "below average/poor," and that she was not qualified to

act as a trainer in March of 2010. Answer to Motion for Summary Judgment, 10/20/15, at Exhibit 74 (Laurie Affidavit, 9/20/15, at ¶¶ 9, 10, 12, 15, 17, 19).

Ms. Coyne and Ms. Bonisese were the only training staff working with the football players on March 29, 2010; the College had no certified athletic trainers on the practice field that day. Lackawanna's Statement of Material Facts, 12/2/15, at Exhibit O ¶ 89; Answer to Motion for Summary Judgment at Exhibit 33 (Bonisese at 54–55). A football teammate, Christopher Yoo, testified that Ms. Coyne and Ms. Bonisese were the trainers and the only trainers in the program as of the spring of 2010. Answer to Motion for Summary Judgment, 10/20/15, at Exhibit 44 (Yoo Deposition, 1/7/15, at 105). Similarly, teammate Anthony Carillo testified that Ms. Coyne and Ms. Bonisese represented themselves as trainers and that the coaching staff propagated that representation. *Id.* at Exhibit 45 (Carillo Deposition, 1/7/15, at 40–44).

The trial court summarized additional facts underlying this case, as follows:

> *A. Plaintiff Justin T. Resch*
>
> [Justin] began playing football at the age of six. He continued playing football through high school and was instructed, on numerous occasions, that making a proper tackle involves keeping one's head up. Along the way, [Justin] broke his arm, injured his ankle, broke his collarbone, and experienced a "stinger, burner, or pinched nerve" while playing football. He graduated from Piu[s] X High School in 2008, applied to Defendant Lackawanna College a/k/a Lackawanna Junior College

(hereinafter "Lackawanna") in Scranton, was accepted, and sought to continue playing football. Though he met with Lackawanna's head football coach, Defendant Mark D. Duda, prior to arriving for classes, [Justin] was not offered an athletic scholarship to play football.

In the fall of 2008, [Justin] tried out for the Lackawanna football team. Again, he was instructed to make tackles with his head up. During tryouts, [Justin] was aware that Lackawanna was using a variation of the tackling drill called the "Man Maker," "One-on-One," or "Oklahoma" drill (hereinafter the "Oklahoma Drill"). Shortly thereafter, [Justin] was placed on academic probation for bad grades. Despite this, Lackawanna allowed him to enroll in the spring semester. In the spring of 2009, he again tried out for the football team, but failed to make the squad. This fact notwithstanding, [Justin] was academically ineligible to play football through the 2008-2009 academic year. After returning to Lackawanna in mid-January of 2010 to begin spring semester classes, [Justin] began running and weight training in preparation for football tryouts.

### B. Plaintiff Augustus Feleccia

[Gus] began playing football at the age of ten. He continued playing football through high school and was instructed, on numerous occasions, that making a proper tackle involves keeping one's head up. In 2003, [Gus] injured his lower back playing football. He graduated from Lansdale Catholic High School in 2008. Despite being recruited by Defendant Duda to play football at Lackawanna, [Gus] was not offered an athletic scholarship to play football.

In the fall of 2008, [Gus] tried out for the Lackawanna football team. Again, he was instructed to make tackles with his head up. During tryouts, [Gus] was aware that Lackawanna was using a variation of the Oklahoma Drill. Though he tried out, [Gus] did not make the team, was redshirted, and was allowed to practice with the team during the fall of 2008. During that time, he tore the labrum in his left shoulder during a scrimmage and, later, underwent reparative surgery. Shortly thereafter, [Gus] was placed on academic probation. He withdrew from Lackawanna after the fall of 2008 semester and, in the spring of 2009, enrolled in the Montgomery County Community College. He reenrolled at Lackawanna for the spring semester of 2010.

After returning to Lackawanna in mid-January of 2010 to begin spring semester classes, [Gus] began running and weight training in preparation for football tryouts.

*C. The Waiver*

In anticipation of spring football tryouts in 2010, [Gus and Justin] were presented with, "skimmed," and signed, on March 22, 2010, a document titled "Lackawanna College Waiver of Liability and Hold Harmless Agreement" (hereinafter "the Waiver").[3] The Waiver, in [relevant part], provides:

\* \* \*

1. In consideration for my participation in (sport), I hereby release, waive, discharge, and covenant not to sue Lackawanna College, its trustees, officers, agents, and employees from any and all liability, claims, demands, actions, and causes of action whatsoever arising out of or related to any loss, damage, or injury, including death, that may be sustained by me, or to any property belonging to me, while participating in such athletic activity.

\* \* \*

4. It is my express intent that this Release and Hold Harmless Agreement shall bind my family, if I am alive, and my heirs, assigns, and personal representative, if I am deceased, and shall be deemed as a release, waiver, discharge, and covenant not to sue Lackawanna College, its trustees, officers, agents, and employees. I hereby further agree that this Waiver of Liability and Hold Harmless Agreement shall be construed in accordance with the laws of the Commonwealth of Pennsylvania.

\* \* \*

---

[3] Both Gus and Justin indicated on the Waiver that they were participating in football. Lackawanna's Statement of Material Facts, 12/2/15, at Exhibit E.

Both [Gus and Justin] admitted to knowing that by signing the Waiver, they had agreed not to sue Lackawanna or its agents for any injuries incurred while playing football at Lackawanna.

*D. The Oklahoma Drill*[4]

On March 29, 2010, both [Gus and Justin] participated in a variation of the Oklahoma Drill at Lackawanna's first fully padded, full contact tryout practice of the season. [Gus and Justin's] expert neither defines the drill nor acknowledges its use in the sport of football. [Lackawanna's] expert explains that the Oklahoma Drill is "a live contact drill that is usually performed in a confined space." He opines that "there are many variations of the Oklahoma Drill," including those used at Texas A&M University and Virginia Tech University, described as follows:

**A. Texas A&M Oklahoma Drill ("Tunnel of Truth") (Procedure)**
1. Create a shoot approximately 10 yards in length and about 4–5 yards wide.
2. Have either a Running Back tie up with a Linebacker, or a Defensive Back tie up with a Wide Receiver. An offensive player will then receive the ball and try to read the block in front of him and evade the free defender waiting in the shoot.

**(Coaching Points)**
1. The defender in the tie up will demonstrate proper block shedding technique while the offensive player will demonstrate proper stalk blocking technique.
2. The ball carrier must read the block and make the appropriate cut with proper pad level and ball security. The free defender must stay square, work downhill towards the ball carrier, and deliver a good, hard, fundamental tackle.

_____

[4] The record suggests that the drill was actually a variation of the "Oklahoma Drill" that Coach Reiss referred to as the "Man-Maker Drill." Answer to Motion for Summary Judgment, 10/16/15, at Exhibit 45 (Carillo at 52).

. . .

**B. Virginia Tech Oklahoma Drill**
**(Procedure)**
1.	This is a one-on-one tackling drill (Defensive Backs/Linebackers vs. Running Backs/Wide Receivers)
2.	The shoot is approximately 10 yards in length, and two cones create a width of approximately 2 yards.
3.	The two players come down the shoot and engage at the cones.

**(Coaching Points)**
1.	The defender must demonstrate proper tackling technique.
2.	The ball carrier must demonstrate proper pad level and ball security.

\* \* \*

Significantly, both [Gus and Justin] had previously participated in a variation of the Oklahoma Drill either in high school or at Lackawanna. When [Justin] signed the Waiver on March 22, 2010, he understood that a variation of the Oklahoma Drill might be used at future Lackawanna football practices and that he could be injured while participating in such drills. Similarly, when [Gus] signed the Waiver on March 22, 2010, he understood that the Oklahoma Drill would be run at Lackawanna's first football practice using only a running back, linebacker, and maybe a quarterback.

While participating in the drill, [Justin] attempted to make a tackle with his head down and suffered a T-7 vertebral fracture. As [Gus] describes it, [Justin] "put his head down, hit him with his head and just went limp on the ground and kind of rolled over." [Gus] went on to admit that [Justin's] tackle was improper because "his head was down and he led with the top of his head." [Justin] recalls that while lying on the ground in pain, he was attended to by "one of the first responders," namely Defendant Kaitlin M. Coyne, before being transported to the hospital in an ambulance.

Despite [Justin's] injury, the Oklahoma Drill continued. When [Gus] attempted his first tackle, he endured a "stinger" to his right shoulder, an injury he understood as "when your arm tingles." He described his injury as feeling "tingly and numb" and that he "couldn't really move his right shoulder as well." Following his injury, [Gus] sought guidance from Defendant Alexis D. Bonisese, the other first responder employed by Lackawanna to monitor football practices. [Gus] testified that Bonisese told him he could return to practice "if he was feeling better," and that he was "feeling a little better" when he returned to practice, even though his pain had "not totally" gone away. He then participated in the Oklahoma Drill again, made a tackle with his right shoulder, and suffered a traumatic brachial plexus avulsion on his right side.

Trial Court Opinion, 2/2/16, at 1–7 (internal citations, brackets, and footnotes omitted).

Gus and Justin initiated the underlying lawsuit by writ of summons on March 28, 2012. They filed a complaint on May 4, 2012, advancing claims of negligence and negligence *per se* and requesting punitive damages. Lackawanna filed preliminary objections asserting that Gus and Justin failed to allege legally sufficient negligence claims against Lackawanna and that the punitive-damage claims do not constitute an independent cause of action under Pennsylvania law; therefore, Lackawanna argued, the complaint should be dismissed as legally insufficient. The trial court overruled the preliminary objections on September 4, 2012, thus declining to find any of the claims legally insufficient or to dismiss them as a matter of law. Lackawanna filed an answer with new matter on October 5, 2012, raising, *inter alia*, the Waiver and assumption of the risk as defenses.

At the close of discovery, Lackawanna filed a motion for summary judgment, relying primarily on the Waiver and an assumption-of-the-risk defense. Motion for Summary Judgment, 7/31/15, at ¶¶ 9, 10. Lackawanna also claimed that Ms. Coyne and Ms. Bonisese were immune from liability under the Pennsylvania Good Samaritan Act; that Gus and Justin could not maintain a cause of action for negligence *per se* under the Medical Practice Act of 1985 because there was no private cause of action under that act; and that Gus and Justin failed to set forth a *prima facie* case of negligence *per se* against Ms. Coyne and Ms. Bonisese because they were not subject to the regulations of licensed athletic trainers. **Id.** at ¶¶ 11, 12, 13, 14.

Gus and Justin argued in response that the College "ran its Athletic Training Department in a manner demonstrating a total disregard for the safety of its student-athletes or the laws of the Commonwealth of Pennsylvania." Memorandum in Opposition to Motion for Summary Judgment, 10/20/15, at 1. Relying on expert opinion, Gus and Justin claimed that the "coaches should have insisted that the College provide competent medical coverage and all of them failed to do that." *Id.* at 12. Moreover, Gus and Justin asserted that the College failed to provide qualified athletic trainers who could have directed an end to or a modification of the improperly conducted drill in the interest of the student athlete's safety, and who would have been able to properly assess Gus' "stinger" and advise him against returning to the drill. *Id.* at 16–20.

Following oral argument on November 19, 2015, the trial court granted Lackawanna summary judgment based on the Waiver and, alternatively, on assumption of the risk. Order, 2/2/16.[5] Gus and Justin timely appealed. They and the trial court complied with Pa.R.A.P. 1925.

On appeal, Gus and Justin raise the following issues for our review:

> Did the trial court abuse its discretion or err as a matter of law by granting [Defendants'] Motion for Summary Judgment, when:
>
> - The trial court failed to analyze the record in the light most favorable to [Gus and Justin];
>
> - The trial court erred by failing to consider whether [Defendants'] conduct constituted recklessness or gross negligence, as alleged in the Complaint;
>
> - [Defendants] limited their defense to assumption of the risk;
>
> - [Lackawanna's] Waiver of Liability and Hold Harmless Agreement ("Waiver")/exculpatory clause did not expressly state in a clear and unambiguous manner that it was a waiver of [Lackawanna's] own negligence;
>
> - The trial court erred by finding that the Waiver, which contravened public policy, barred [Gus' and Justin's] claims and was void; and, therefore
>
> - The Court erred by failing to submit the disputed factual questions to a jury?

Gus and Justin's Brief at 4.

_____

[5] Recently, this Court opined that a liability waiver constitutes an express assumption of the risk. **_Valentino v. Philadelphia Triathlon, LLC._**, 150 A.3d 483, 2016 PA Super 248 at *13 (Pa. Super. filed November 15, 2016).

- 12 -

"The overarching question of whether summary judgment is appropriate is a question of law, and thus our standard of review is *de novo* and the scope of review is plenary." ***Chepkevich v. Hidden Valley Resort, L.P.***, 2 A.3d 1174, 1182 (Pa. 2010) (internal citation omitted). Furthermore:

> [i]n reviewing the grant of summary judgment, the following principles apply. [S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is de novo. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

***Kennedy v. Robert Morris Univ.***, 133 A.3d 38, 41 (Pa. Super. 2016), *appeal denied*, 145 A.3d 166 (Pa. 2016) (quoting ***Summers v. Certainteed Corp.***, 997 A.2d 1152, 1159 (Pa. 2010) (internal quotations and citations omitted)).

**The Waiver**

In granting summary judgment to Lackawanna, the trial court relied primarily on the Waiver. It is generally accepted that a waiver, or exculpatory clause, is valid where three conditions are met. First, the clause must not contravene public policy. **Chepkevich**, 2 A.3d at 1189; **Topp Copy Products, Inc. v. Singletary**, 626 A.2d 98 (Pa. 1993); **Employers Liab. Assu. Corp. v. Greenville Business Men's Ass'n**, 224 A.2d 620 (Pa. 1966). "Contracts against liability, although not favored by courts, violate public policy only when they involve a matter of interest to the public or the state. Such matters of interest to the public or the state include the employer-employee relationship, public service, public utilities, common carrier, and hospitals." **Seaton v. E. Windsor Speedway, Inc.**, 582 A.2d 1380, 1382 (Pa. Super. 1990). "Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion." **Chepkevich**, 2 A.3d at 1189 (citations omitted); **see also Toro v. Fitness International, LLC.**, 150 A.3d 968, 2016 PA Super 243 (Pa. Super. filed November 10, 2016) (applying **Chepkevich** to a waiver raised as a defense to a negligence claim in a slip-and-fall case); **McDonald v. Whitewater Challengers, Inc.**, 116 A.3d 99 (Pa. Super. 2015), *appeal denied*, 130 A.3d 1291 (Pa. 2015) (applying **Chepkevich** to a waiver signed

by a New York resident and raised as a defense to a negligence claim in a whitewater rafting case).

> [O]nce an exculpatory clause is determined to be valid, it will, nevertheless, still be unenforceable unless the language of the parties is clear that a person is being relieved of liability for [their] own acts of negligence. In interpreting such clauses we listed as guiding standards that: 1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt, by express stipulation, and no inference from words of general import can establish the intent of the parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing the immunity is upon the party invoking protection under the clauses.

*Chepkevich*, 2 A.3d at 1189 (citations omitted).

On appeal, Gus and Justin first argue that summary judgment was improper because the trial court erred in not allowing a jury "to decide whether the scope of [the College's] conduct exceeded the Waiver." Gus and Justin's Brief at 25. Gus and Justin acknowledge that the Waiver "released [Lackawanna] from negligence claims[.]" *Id.* at 23. According to Gus and Justin, however, "by requiring athletes to waive their right to sue," the College had a duty "to assure that [it] hired qualified personnel to assess and treat foreseeable injuries," that "its staff was adequately trained" and certified, and that "it took reasonable measures to assure the safety of its student athletes." *Id.* at 25. Therefore, Gus and Justin contend, the question of "whether [the College's] failure to hire qualified personnel

- 15 -

constitutes negligence, gross negligence or recklessness . . . should be left to the jury." *Id.* at 27.

In support of their position that the Waiver cannot be used as a shield against claims of gross negligence or recklessness, Gus and Justin rely on *Tayar v. Camelback Ski Corp.*, 47 A.3d 1190 (Pa. 2012). Gus and Justin's Brief at 27–29. Therein, Barbara Tayar and her family elected to use the family tubing slopes at Camelback Ski Resort. They completed four successful runs down the mountain, with appellant Brian Monaghan, a Camelback employee, releasing them from the summit safely each time. *Id.* at 1193. On the fifth run, when Barbara Tayar reached the receiving area at the bottom of the slope:

> she exited her snow tube and was immediately struck by another snow tuber coming down the family tubing slope. Camelback employees rushed to assist Tayar out of the receiving area, when yet another snow tuber narrowly missed striking her. At this point, several Camelback employees were yelling and gesturing up the mountain to Monaghan to stop sending snow tubers down the slope until they could safely remove Tayar from the receiving area. As a result of the collision, Tayar suffered multiple comminuted fractures of her right leg, for which she underwent surgery and required two metal plates and 14 screws to stabilize her ankle.

*Id.*

*Tayar* was a case of first impression in which our Supreme Court addressed the public policy question of whether recklessness can be released in a pre-injury exculpatory clause. The *Tayar* Court first considered where

recklessness falls on the spectrum of tortious conduct—closer to waivable

common negligence or to non-waivable intentional conduct:

> Recklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious inadvertence. **In Fitsko v. Gaughenbaugh**, 69 A.2d 76 (Pa. 1949), we cited with approval the Restatement (Second) of Torts definition of "reckless disregard" and its explanation of the distinction between ordinary negligence and recklessness. Specifically, the Restatement (Second) of Torts defines "reckless disregard" as follows:

>> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

> Restatement (Second) of Torts § 500 (1965). The Commentary to this Section emphasizes that "[recklessness] must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent." **Id.**, cmt. a. Further, as relied on in **Fitsko**, the Commentary contrasts negligence and recklessness:

>> Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.... The difference between reckless misconduct and conduct involving

- 17 -

only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

*Id.*, cmt. g.

* * *

This conceptualization of recklessness as requiring *conscious* action or inaction not only distinguishes recklessness from ordinary negligence, but aligns it more closely with intentional conduct. As a result, we are inclined to apply the same prohibition on releasing reckless conduct as we do for intentional conduct.

*Tayar*, 47 A.3d at 1200–1201. The *Tayar* Court then concluded:

[W]ere we to sanction releases for reckless conduct, parties would escape liability for consciously disregarding substantial risks of harm to others; indeed, liability would be waivable for all conduct except where the actor specifically intended harm to occur. There is near unanimity across jurisdictions that such releases are unenforceable, as such releases would jeopardize the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct. We therefore conclude that, even in this voluntarily [sic] recreational setting involving private parties, there is a dominant public policy against allowing exculpatory releases of reckless behavior, which encourages parties to adhere to minimal standards of care and safety.

*Tayar*, 47 A.3d at 1203 (internal citation omitted). In sum, the *Tayar* Court held that recklessness cannot be released in a pre-injury exculpatory clause.

Ultimately, the Supreme Court affirmed our *en banc* order reversing the entry of summary judgment and remanding for a determination of whether the defendants' conduct was reckless or intentional and whether such conduct was the cause of the ski patron's injuries. *Tayar*, 42 A.3d at

1203. *Cf. Valentino v. Philadelphia Triathlon, LLC.*, 150 A.3d 483, 2016 PA Super 248 (Pa. Super. filed November 15, 2016) (affirming the entry of summary judgment based on a signed waiver where the trial court struck all references in the plaintiff's amended complaint to gross negligence, recklessness, and punitive damages).

Lackawanna argues, "The Waiver's clear language demonstrates the intent of the Students to release Lackawanna of all liability by express stipulation." Lackawanna's Brief at 39. Additionally, Lackawanna contends that the gross negligence and recklessness claims were raised in counts for punitive damages, not in substantive counts; therefore, they do not provide independent grounds for recovery. *Id.* at 42–43. Thus, Lackawanna avers, *Tayar* is not applicable "in this appeal as [it] did not involve allegations of reckless [sic] pleaded in an independent cause of action for punitive damages." *Id.* at 43.

While recognizing that our courts have yet to address waivers of liability in collegiate football, the trial court relied on "the standards governing the validity of exculpatory clauses" set forth in *Chepkevich* and *Topp Copy*. Trial Court Opinion, 2/2/16, at 10. In doing so, the trial court initially concluded that the Waiver met the requirements for validity: (1) it did not violate public policy because football is an inherently dangerous sport, *id.* at 11–14; (2) it related entirely to the private affairs of Gus,

- 19 -

Justin, and the College, *id.* at 14–15; and (3) it was not a contract of adhesion, *id.* at 15–18.

Next, the trial court addressed the Waiver's enforceability, applying the standards also set forth in *Chepkevich* and *Topp Copy*. Trial Court Opinion, 2/2/16, at 18. Focusing solely on Gus and Justin's averments of negligence, the trial court concluded that the Waiver was enforceable because the College met its burden of proving that, when strictly construed, the Waiver's language was sufficiently particular and unambiguous to provide immunity. *Id.* at 18–22. The trial court also recognized that the Oklahoma Drill has been criticized in the wake of the NFL Concussion Litigation, but it discounted the significance of the criticism in light of the types of injures that Gus and Justin experienced. *Id.* at 21.

Upon review, we conclude that, as in other inherently dangerous activities, the Waiver is valid. Like the trial court, we agree that the Waiver does not violate public policy, relates to the private affairs of the parties, and is not a contract of adhesion. Indeed, Gus and Justin do not specifically challenge the trial court's analysis of the second and third requirements for the validity of the Waiver. Nevertheless, we disagree with the trial court that the Waiver is enforceable under the facts of this case for multiple reasons. First, the language of the Waiver is not sufficiently particular and without ambiguity as to preclude liability. We have explained, "[O]nce an exculpatory clause is determined to be valid, it will, nevertheless, still be

unenforceable **unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence**." **Chepkevich**, 2 A.3d at 1189 (emphasis supplied). Although valid, the Waiver's language does not indicate that Lackawanna was being relieved of liability for its own acts of negligence.

Second, as noted above, in addition to averring negligence, Gus and Justin raised issues of gross negligence and recklessness. Complaint, 5/9/12, at ¶¶ 80, 82, 93, 102, 103, 119. In its summary judgment memorandum, the trial court did not address the averments of gross negligence and recklessness or whether such conduct rendered the Waiver unenforceable. Instead, the trial court discounted these allegations within a footnote that stated punitive damages do not exist as a separate claim under Pennsylvania law. Trial Court Opinion, 2/2/16, at 27, n.13. We do not find such a statement dispositive of whether there were sufficient allegations of recklessness or gross negligence for purposes of the enforceability of the Waiver. Indeed, we find that this omission resulted in an incomplete analysis by the trial court and, ultimately, led it to reach an incorrect conclusion.

Summary judgment requires the trial court to review the "(1) pleadings, discovery materials, *i.e.*, depositions, answers to interrogatories, admissions and affidavits, and reports signed by an expert witness. ..."

Pa.R.C.P. 1035.1 cmt (internal quotation marks omitted). In their complaint, Gus and Justin averred:

- gross negligence and recklessness against Lackawanna College at ¶¶ 82(a)–(i);

- gross negligence and recklessness against Coach Duda at ¶¶ 97(h), (l), (m)–(r), 98(l)–(r);

- gross negligence and recklessness against Assistant Coaches Reiss and Lamagna at ¶¶ 102(j), 103(j).

Complaint, 5/4/12. Additionally, Gus and Justin raised issues of gross negligence and recklessness in their Reply to Preliminary Objections, 7/16/12, at ¶¶ 2, 3, 14, 21; in their Memorandum of Law in Reply to Preliminary Objections, 7/26/12, at unnumbered 6–8; and in their Memorandum of Law in Opposition to Motion for Summary Judgment, 10/20/15, at 29, 32, 37, 41, and 44.

Moreover, fellow student athletes identified Ms. Coyne and Ms. Bonisese as the College's athletic trainers in the spring of 2010. Answer to Motion for Summary Judgment, 10/20/15, at Exhibits 44 (Yoo at 105) and 45 (Carillo at 40–44). Also, experts M. Scott Zema, Associate Athletic Director, Stevenson University, and Betsy Mitchell, Director of Athletics, California Institute of Technology, opined that the College's conduct in hiring Ms. Coyne and Ms. Bonisese as athletic trainers fell below the applicable standard of care. *Id.* at Exhibits 95 (Report of M. Scott Zema, 4/9/15, at unnumbered 12–13) and 94 (Report of Betsy Mitchell, 4/14/15, at 4–5).

Additionally, expert Richard C. Slocum, former Texas A&M University head football coach for fourteen years, stated:

> In all my years of being involved in football, I cannot recall seeing a football drill as oblivious to the safety of its players as the one that I watched on video at Lackawanna College during the Spring of 2010. In fact I have I have [sic] never seen the drill run as it was at Lackawanna. It was conducted in a way that had very little application to playing the game of football and that elevated the possibility of serious injury. In addition, there was little, or no consideration given in the event a player sustained a serious injury.
>
> * * *
>
> After reviewing numerous documents, many depositions and deposition exhibits, there is no question in my mind that what happened to Gus Feleccia and Justin Resch on March 29, 2010 was the end result of overall systemic failure on the part of the College, its Athletic Department and, in particular, those persons responsible for the Football Program. Simply put, none of the defendants demonstrated any appreciable concern for the safety of the student-athletes.

Answer to Motion for Summary Judgment, 10/16/15, at Exhibit 93 (Report of Richard C. Slocum, 4/13/15, at 3–4).

Notably, the College's coaching staff "had never heard" the term "first responder" prior to this incident and assumed it meant "being the first to respond." Memorandum of Law in Opposition to Motion for Summary Judgment, 10/20/15, at 8 (citing Answer to Motion for Summary Judgment, 10/16/15, at Exhibits 34, 35, 37). Yet, Lackawanna's expert, Dr. William Dempsey, testified that Ms. Coyne and Ms. Bonisese were first responders who acted according to the applicable standard of care. Answer to Motion for Summary Judgment, 10/16/15, at Exhibit 48 (Dr. William Dempsey

Report, 7/14/15, at ¶¶ IV, VI). Moreover, Dr. Ray Angeli, President of the College, indicated that he was not willing to pay the salary that athletic trainers requested because it was higher than a first year professor's salary. *Id.* at Exhibit 28 (Dr. Angeli Deposition, 7/25/13, at 90–93). Lastly, consulting economist, Andrew Verzilli, reviewed the 2001–2002 through 2009–2010 athletic department budgets and concluded that the department "had sufficient funds available to hire a full-time Athletic Trainer" for the 2009–2010 academic year. *Id.* at Exhibit 96 (Letter Report of Andrew Verzilli, 4/15/15). In light of this record, the trial court erred in determining that the Waiver was enforceable without considering the scope of the Waiver with regard to claims of gross negligence and reckless conduct.

Our third and most important reason for rejecting the trial court's analysis is that a genuine issue of material fact exists as to whether the College's failure to have qualified medical personnel at the March 29, 2010 practice constitutes gross negligence or recklessness, the latter of which, pursuant to *Tayar*, cannot be waived in a pre-injury exculpatory release. We analyze whether the College's failure to have qualified medical personnel at the March 29, 2010 practice constitutes gross negligence or recklessness through the lens of *Kleinknecht v. Gettysburg College*, 989 F.2d 1360 (3rd Cir. 1993).[6] Therein, the Third Circuit Court of Appeals addressed the

_____

[6] We acknowledge that:
*(Footnote Continued Next Page)*

provision of medical assistance in the context of collegiate sports. Drew Kleinknecht, a sophomore lacrosse player, suffered a cardiac arrest during a fall practice. No athletic trainers were present at the practice, and "despite repeated resuscitation efforts, Drew could not be revived." *Id.* at 1364. Drew's parents filed suit against Gettysburg College, arguing that, given Drew's status as a student athlete, the college owed "a duty to its intercollegiate athletes to provide preventative measures in the event of a medical emergency." *Id.* at 1366. In resolving the duty issue, the *Kleinknecht* Court explained that Drew "was participating in a scheduled athletic practice for an intercollegiate team sponsored by the [c]ollege under the supervision of [c]ollege employees." *Id.* at 1367. On these facts, the Third Circuit Court of Appeals predicted "that the Supreme Court of Pennsylvania would hold that a special relationship existed between the [c]ollege and Drew that was sufficient to impose a duty of reasonable care

*(Footnote Continued)* ───────────

federal court decisions do not control the determinations of the Superior Court. Our law clearly states that, absent a United States Supreme Court pronouncement, the decisions of federal courts are not binding on Pennsylvania state courts, even when a federal question is involved.... [However, w]henever possible, Pennsylvania state courts follow the Third Circuit so that litigants do not improperly "walk across the street" to achieve a different result in federal court than would be obtained in state court.

*McDonald*, 116 A.3d at 106 n.13 (quoting *NASDAQ OMX PHLX, Inc. v. PennMont Secs.*, 52 A.3d 296, 303 (Pa. Super. 2012) (citations omitted)).

on the [c]ollege. Other states have similarly concluded that a duty exists based on such a relationship." *Id.* (citing Indiana and Florida cases).

Additionally, the ***Kleinknecht*** Court agreed with Drew's parents regarding the foreseeability of student athletes sustaining severe and even life-threatening injuries while engaged in athletic activity, and the unreasonableness of a college's failure to protect against such a risk. ***Kleinknecht***, 989 F.2d at 1369–1370. The Third Circuit Court of Appeals predicted "that the Supreme Court of Pennsylvania would hold that a college also has a duty to be reasonably prepared for handling medical emergencies that foreseeably arise during a student's participation in an intercollegiate contact sport." *Id.* at 1371.

We consider the ***Kleinknecht*** decision persuasive. Like Drew, Gus and Justin were injured while participating in a scheduled practice for an intercollegiate athletic team sponsored by the College while on the College's property and under the supervision of the College's employees. ***Cf. Kennedy***, 133 A.3d 38 (affirming grant of summary judgment to the university because it owed no duty to a student cheerleader who was injured at a cheerleading camp held off campus and directed by an independent contractor). Accordingly, we hold that the College owed Gus and Justin a duty of care in their capacity as intercollegiate athletes engaged in a school-sponsored and supervised intercollegiate athletic activity. ***Kleinknecht***, 989 F.2d at 1369. We further hold that the College's duty of care to its

intercollegiate student athletes required it to have qualified medical personnel available at the football tryout on March 29, 2010, and to provide adequate treatment in the event that an intercollegiate student athlete suffered a medical emergency. *Id.* at 1369–1370.[7] Lastly, we hold that the determinations of whether the College breached this duty to Gus and Justin and whether that breach caused the student athletes' damages are questions of fact for the jury. *Id.* at 1371. Thus, the trial court erred in determining that the Waiver was enforceable without considering whether the College's conduct in failing to provide qualified medical personnel at the March 29, 2010 practice was grossly negligent or reckless.

Upon review of the record and *Tayar*, and in light of our holdings based on *Kleinknecht*, we conclude that the trial court's analysis was incomplete and incorrect. It erred in finding that the Waiver was enforceable because the Waiver would not release Lackawanna from, at least, its own reckless conduct as a matter of law. *Tayar*. Moreover, Gus and Justin sufficiently pled gross negligence and recklessness in their complaint with regard to the College's failure to provide qualified trainers. *Kleinknecht*. Additionally, Gus and Justin proffered sufficient evidence in the form of testimony from fellow student athletes and experts in athletics and athletic training to raise a genuine issue of material fact regarding the

_____

[7] As this case involved the use of a waiver in the athletic program of a junior college, we limit our holdings to intercollegiate sports.

scope of the Waiver and whether Lackawanna was grossly negligent or reckless. Thus, the trial court erred in entering summary judgment.

Gus and Justin further argue on appeal that the Waiver "cannot relieve a party of liability for violating the law."[8] Gus and Justin's Brief at 30. According to Gus and Justin, Lackawanna violated Pennsylvania law by employing Ms. Coyne and Ms. Bonisese on March 29, 2010, because they were not qualified athletic trainers and because Ms. Bonisese made a "return to play" decision. *Id.* (citing 63 P.S. § 422.51a).[9] Thus, they conclude,

_____

[8] We interpret Gus and Justin's position as invoking the concept of negligence *per se*, which:

> establishes both duty and the required breach of duty where an individual violates an applicable statute, ordinance or regulation designed to prevent a public harm. A plaintiff, however, having proven negligence *per se*, cannot recover unless it can be proven that such negligence was the proximate cause of the injury. ***J.E.J. v. Tri-County Big Brothers/Big Sisters***, 692 A.2d 582, 585 (Pa. Super. 1997).

***Cabiroy v. Scipione***, 767 A.2d 1078, 1079 (Pa. Super. 2001).

[9] Section 422.51a of the Medical Practice Act, 63 P.S. §§ 422.1–422.51a is the statutory authority regarding athletic trainers. Gus and Justin also cite 49 Pa. Code § 18.503. Gus and Justin's Brief at 7. Title 49 section 18.50 of the Pennsylvania Code regulates the conduct of athletic trainers, in relevant part, as follows:

> (a) A person may not use the title "athletic trainer" or "licensed athletic trainer" or use any abbreviation including "A.T.," "A.T.L." or "L.A.T." or any similar designation to indicate that the person is an athletic trainer unless that person has been licensed by the Board.

*(Footnote Continued Next Page)*

"[T]he trial court should have allowed the jury to decide whether the Waiver was valid and whether [Lackawanna's] conduct was so egregious as to render the [W]aiver unenforceable." *Id.* at 34.

Lackawanna responds that the laws related to athletic trainers are not applicable to this case because Ms. Coyne and Ms. Bonisese were first responders; additionally, Lackawanna asserts that Ms. Coyne and Ms. Bonisese have statutory immunity as Good Samaritans.[10]  Lackawanna's

_____
*(Footnote Continued)*

> (b) Except as otherwise provided in this subsection, a person may not perform the duties of an athletic trainer unless that person is licensed by the Board….

49 Pa. Code § 18.50(a), (b).

[10]  The Medical Good Samaritan civil immunity statute provides as follows:

> **(a) General rule.**—Any physician or other practitioner of the healing arts or any registered nurse, licensed by any state, who happens by chance upon the scene of an emergency or who arrives on the scene of an emergency by reason of serving on an emergency call panel or similar committee of a county medical society, or who is called to the scene of an emergency by the police or other duly constituted officers of a government unit, or who is present when an emergency occurs and who, in good faith, renders emergency care at the scene of the emergency, shall not be liable for any civil damages as a result of any acts or omissions by such physician or practitioner or registered nurse in rendering the emergency care, except any acts or omissions intentionally designed to harm or any grossly negligent acts or omissions which result in harm to the person receiving emergency care.
>
> **(b) Definition.**—As used in this section 'good faith' shall include, but is not limited to, a reasonable opinion that the

*(Footnote Continued Next Page)*

Brief at 10, 12, 29. Lackawanna further contends that negligence *per se* is not an available basis for recovery because "there was no legal requirement in Pennsylvania or standard in the NJCAA requiring a Certified Athletic Trainer to be on the college practice field." ***Id.*** at 12. According to Lackawanna, therefore, it had no duty to have qualified trainers as a matter of law. ***Id.*** at 11.

Again, the trial court did not address Gus and Justin's averments of negligence *per se*. Moreover, we consider Lackawanna's First Responder and Good Samaritan arguments disingenuous and inapplicable. When viewed in the light most favorable to Gus and Justin, the record reveals that Ms. Coyne and Ms. Bonisese were hired as medical providers. On March 29, 2010, they were acting within the scope of their employment in the College's athletic training department. They each signed an athletic-trainer job description, and student athletes understood them to be athletic trainers. Furthermore, the record contains conflicting testimony which, when viewed in a light most favorable to Gus and Justin, suggests that Ms. Bonisese made an unauthorized return-to-play decision about Gus by telling him he should wait until his arm felt better and then he could return to the drill. Answer to Motion for Summary Judgment, 10/16/15, at Exhibit 33 (Bonisese at 37,

*(Footnote Continued)* ───────────────

> immediacy of the situation is such that the rendering of care should not be postponed until the patient is hospitalized.

42 Pa.C.S. § 8331(a), (b).

40), Exhibit 46 (Gus Deposition, 3/7/14, at 79). Based on the record at hand, therefore, we conclude that a jury must determine if Ms. Coyne and Ms. Bonisese were acting as athletic trainers and if the College's employment of them at the practice was negligence *per se* and resulted in harm to Gus and Justin. 42 Pa.C.S. § 8331.

## Assumption of the Risk

In granting summary judgment to Lackawanna, the trial court relied alternatively on Lackawanna's assumption-of-the-risk defense. Trial Court Opinion, 2/2/16, at 22–26. Regarding assumption of the risk, this Court has held that:

> the assumption of the risk doctrine is a "function of the duty analysis" required in any negligence action . . . . [**Montagazzi v. Crisci**, 994 A.2d 626, 636 (Pa.Super. 2010)]. Under this formulation of the doctrine, a person relieves another of any duty to alleviate dangers when he voluntarily proceeds "to encounter a known or obvious danger." [**Carrender v. Fitterer**, 469 A.2d 120, 125 (Pa. 1983)]. Accordingly, in **Montagazzi** we reiterated that "the question of assumption of the risk typically remains for the jury," and that "only where the evidence reveals a scenario so clear as to void all questions of material fact concerning the plaintiff's own conduct can the court enter summary judgment." **Montagazzi**, 994 A.2d at 636.

**Thompson v. Ginkel**, 95 A.3d 900, 906–907 (Pa. Super. 2014), *appeal denied*, 108 A.3d 36 (Pa. 2015). "[T]he court may determine that no duty exists only if reasonable minds could not disagree that the plaintiff deliberately and with awareness of specific risks inherent in the activity nonetheless engaged in the activity that produced his injury." **Howell v. Clyde**, 620 A.2d 1107, 1112–1113 (Pa. 1993) (plurality).

Gus and Justin challenge the trial court's entry of summary judgment on the basis that they assumed the risk of playing football. Gus and Justin's Brief at 35. Gus and Justin argue that they did not assume the amplified risks of the College providing unqualified personnel at the full-contact tryout. *Id.* at 38–39.

Lackawanna responds, "The issue in this appeal . . . is <u>not</u> whether Lackawanna breached the standard of care. The actual issue on appeal is whether Lackawanna has any duty at all when [Gus and Justin] knowingly and voluntarily assumed the risk of injury playing football." Lackawanna's Brief at 21 n.18 (emphasis in original). According to Lackawanna, whether Gus and Justin assumed the risk of participating in football is a "duty" question to be decided by the trial court. *Id.* at 21. Lackawanna asserts that it "had no duty as a factual matter to protect [Gus and Justin] from their knowing and voluntary" participation in the football practice, and, therefore, it cannot be deemed to have been negligence. *Id.* at 10.

Without addressing the lack of qualified athletic trainers, the trial court analyzed the assumption-of-the-risk defense as follows:

> Here, . . . both [Gus and Justin] were "experienced ball-players," [Justin] having played football since he was six-years-old and [Gus] having played since he was ten. Both [Gus and Justin] understood the dangers of the sport, as both had been injured previously while playing football. Both had previously participated in a variation of the Oklahoma Drill either in high school or college, and both knew that Lackawanna used the drill. Both had the opportunity to observe the drill several times on March 29, 2010 before participating in it. Neither [Gus nor Justin] testified that they discussed the drill with Lackawanna's

coaches prior to their participation. Additionally, contrary to [Gus and Justin's] contentions in their Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, neither [Gus nor Justin] testified that their coaches told them they would not be able to play football if they did not participate in the Oklahoma Drill. Therefore, we find that [Gus and Justin] voluntarily faced the risk presented.

From the facts discussed above, we conclude that [Gus and Justin] voluntarily and knowingly proceeded in the face of an obvious and dangerous condition and, therefore, we find that Lackawanna owed no duty to [Gus and Justin]. With no genuine issue of material fact in dispute and, because [Gus and Justin] have failed to produce evidence of facts essential to their causes of action requiring a jury trial, we will, in the alternative . . . grant Lackawanna's Motion for Summary Judgment on the basis of the assumption of risk doctrine and enter judgment in favor of Defendants.

Trial Court Opinion, 2/2/16, at 25–26.

According to Gus and Justin, the trial court's reasoning "misapprehends the issue before the Court." Gus and Justin's Brief at 35. Specifically, Gus and Justin state:

This case presents facts and factual disputes that remove it from the definition of assumption of the risk. If [the College] had hired qualified and certified athletic trainers, and [Gus and Justin] relied upon their advice, then their decision would be knowing and voluntary. But in this case, [the College] chose to hire two persons who were not qualified to be athletic trainers and to allow them to examine and advise students on the football team, who—as here—reasonably assumed that the advice they received was from a person upon whom they could rely.

*Id.* at 39.

We acknowledge that Gus and Justin had prior experience with the drill and had an understanding of the dangers associated with the drill. Answer

- 33 -

to Motion for Summary Judgment, 10/16/15, at Exhibits 46 (Gus at 177, 201–203) and 47 (Justin Deposition, 3/6/15, at 99, 124–125). However, as Gus and Justin posit, although they were aware of the general risks inherent in the sport of football, they were unaware of Lackawanna's failure to take reasonable measures to assure their safety by providing qualified trainers during the drill. Gus and Justin's Brief at 42. *See Kleinknecht*, 989 F.2d 1360 (college has a duty to provide qualified medical personnel to attend student athletes). Hence, we reject Lackawanna's defense. Reasonable minds could disagree as to whether Gus or Justin "deliberately and with the awareness of specific risks inherent in the activity nonetheless engaged in the activity that produced" their injuries, where they signed the Waiver unaware that the College's athletic department did not include qualified athletic trainers. *Howell*, 620 A.2d at 1112–1113; *Kleinknecht*, 989 F.2d at 1369–1370. Thus, we conclude it is for the jury to decide whether the College's employment of unqualified personnel increased the risk of harm to its student athletes, and, if so, whether Gus and Justin assumed a known or obvious danger, *i.e.*, the risk of injury caused by the College's conduct. *Kleinknecht*, 989 F.2d at 1371.

As a final matter, we address the risks inherent in the sport of football. *See Hughes v. Seven Springs Farm, Inc.*, 762 A.2d 339, 343 (Pa. 2000) ("[C]ases involving injuries to the plaintiffs who were . . . participating at sporting events . . . have tended to speak in terms of whether the injury

suffered resulted from a risk 'inherent' in the activity in question; if it did, then the defendant was under no duty to the plaintiff, and the suit could not go forward."). In the case at hand, Gus and Justin's collegiate football expert, Richard Slocum, opined that the drill had little application to playing football. Answer to Motion for Summary Judgment, 10/16/15, at Exhibit 93 (Report of Richard Slocum, 4/13/15, at 3). Contrarily, Lackawanna's football expert opined, "[The drill] precisely replicated realistic game conditions, and was therefore a valuable and productive drill for players." Lackawanna's Statement of Material Facts, 12/2/15, at Exhibit I (Chester L. Parlavecchio Report, 7/15/15, at § IV). Thus, we discern an additional genuine issue of material fact to be resolved by a jury: Is the tackling drill at issue in this case part of the game of football, so that an injury resulting from participation in the drill at the tryout is an inherent risk of football?

Aside from the concern about this practice drill being considered an inherent risk of football, we are concerned with a release being used to excuse a college from having qualified medical personnel readily available to its student athletes. Colleges are expected to put a priority on the health and safety of their students, especially student athletes engaged in dangerous sports.[11] Many colleges profit significantly from student athletes'

_____

[11] Indeed, "[t]he purpose of the athletic training program at Lackawanna College is to provide the utmost quality medical care to the student athletes of the school's intercollegiate athletic programs." Answer to Motion for
*(Footnote Continued Next Page)*

participation in these sports. Enforcing a release and granting summary judgment in a situation where the availability of qualified medical personnel is called into question would jeopardize the health and safety of such student athletes by removing at least one incentive for colleges "to adhere to minimal standards of care and safety." *Tayar*, 47 A.3d at 1203.

In sum, genuine issues of material fact exist. Thus, the trial court erred in granting summary judgment to Lackawanna. Accordingly, we reverse the entry of summary judgment and remand for trial.

Summary judgment reversed. Case remanded for trial. Jurisdiction relinquished.

P.J.E. Stevens did not participate in the decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/24/2017

*(Footnote Continued)* ————————————

Summary Judgment, 10/16/15, at Exhibit 29 (AD Mecca at 69 and Exhibit 5).