**[J-96-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| AUGUSTUS FELECCIA AND JUSTIN T. RESCH, | : | No. 75 MAP 2017 |
| | : | |
| | : | Appeal from the Order of the Superior |
| Appellees | : | Court at No. 385 MDA 2016 dated |
| | : | February 24, 2017, reconsideration |
| | : | denied April 26, 2017, Reversing the |
| v. | : | Judgment of the Lackawanna County |
| | : | Court of Common Pleas, Civil |
| | : | Division, at No. 12-CV-1960 entered |
| LACKAWANNA COLLEGE A/K/A | : | February 2, 2016 and Remanding for |
| LACKAWANNA JUNIOR COLLEGE, KIM | : | trial. |
| A. MECCA, MARK D. DUDA, WILLIAM E. | : | |
| REISS, DANIEL A. LAMAGNA, KAITLIN | : | ARGUED: December 5, 2018 |
| M. COYNE AND ALEXIS D. BONISESE, | : | |
| | : | |
| Appellants | : | |


**OPINION**


**JUSTICE DOUGHERTY**                                        **DECIDED: August 20, 2019**

In this discretionary appeal arising from the dismissal of personal injury claims on summary judgment, we consider whether the Superior Court erred in 1) finding a duty of care and 2) holding a pre-injury waiver signed by student athletes injured while playing football was not enforceable against claims of negligence, gross negligence, and recklessness. After careful review, we affirm the Superior Court's order only to the extent it reversed the trial court's entry of summary judgment on the claims of gross negligence and recklessness, and we remand to the trial court for further proceedings consistent with this opinion.

**I.**

Appellees, Augustus Feleccia and Justin T. Resch, (collectively, appellees) were student athletes who played football at Lackawanna Junior College (Lackawanna), a non-profit junior college. *See* Complaint at ¶¶ 29, 30. At all times relevant to this matter, the following individuals were employed by Lackawanna and involved in its football program: (1) Kim A. Mecca, the Athletic Director for Lackawanna College who oversaw all of Lackawanna's athletic programs, including the football program (AD Mecca); (2) Mark D. Duda, the head coach (Coach Duda); (3) William E. Reiss, an assistant and linebacker coach (Coach Reiss); (4) Daniel A. Lamagna, an assistant and quarterback coach (Coach Lamagna); (5) Kaitlin M. Coyne, hired to be an athletic trainer (Coyne); and (6) Alexis D. Bonisese, hired to be an athletic trainer (Bonisese) (collectively with Lackawanna referred to as appellants). *Id.* at ¶¶31-34, 40, 41, 43, 44.

Lackawanna had customarily employed two athletic trainers to support the football program.[1] However, both athletic trainers resigned in the summer of 2009 and AD Mecca advertised two job openings for the position of athletic trainer. AD Mecca received applications from Coyne and Bonisese, recent graduates of Marywood University who had obtained Bachelor of Science degrees in Athletic Training. AD Mecca conducted telephone interviews with Coyne and Bonisese for the open athletic trainer positions at Lackawanna. *See Feleccia v. Lackawanna College*, 156 A.3d 1200, 1203 (Pa. Super. 2017).

---

[1] In Pennsylvania, in order to use the title "athletic trainer," an individual must be licensed pursuant to the Medical Practice Act. 63 P.S. §422.1, *et. seq.* (MPA). A duly licensed athletic trainer holds a valid certificate issued by the State Board of Medicine (the Board) after passing the national certification exam. 63 P.S. §422.51a(b.1)(1); 18 Pa Code § 18.506. Additionally, Pennsylvania's Administrative Code defines "licensed athletic trainer" as used in the MPA as "[a] person who is licensed to perform athletic training services by the Board." 49 Pa. Code §18.502. For purposes of clarity, throughout this opinion, we use the term "athletic trainer" to describe an individual who holds the required certificate and has been licensed by the Board.

At the time she applied and interviewed for the Lackawanna position, Coyne had not yet passed the athletic trainer certification exam, which she took for the first time on July 25, 2009, and was therefore not licensed by the Board. Bonisese was also not licensed, having failed the exam on her first attempt, and still awaiting the results of her second attempt when she applied and interviewed for the Lackawanna position. Nevertheless, Lackawanna hired both Coyne and Bonisese in August 2009 with the expectation they would serve as athletic trainers, pending receipt of their exam results, and both women signed "athletic trainer" job descriptions. *Id.* After starting their employment at Lackawanna, Coyne and Bonisese both learned they did not pass the athletic trainer certification exam. Coyne informed AD Mecca of her test results, and AD Mecca also learned Bonisese had failed her second attempt at certification. *Id.* at 1203-04.

AD Mecca retitled the positions held by Coyne and Bonisese from "athletic trainers" to "first responders." *Id.* at 1204. AD Mecca notified Coyne and Bonisese via email and written correspondence that due to their failure to pass the certification exam, they would function as "first responders" instead of "athletic trainers." However, neither Coyne nor Bonisese executed new job descriptions, despite never achieving the credentials included in the athletic trainer job descriptions they did sign. Appellants were also aware the qualifications of their new hires was called into question by their college professors and clinic supervisors. *See Id.* More specifically, Shelby Yeager, a professor for Coyne and Bonisese during their undergraduate studies, communicated to AD Mecca her opinion that Coyne and Bonisese were impermissibly providing athletic training services in September 2009. Professor Yeager was aware Lackawanna did not have any full-time

athletic trainers on staff[2] and noted Coyne and Bonisese, as recent graduates, were inexperienced and did not have the required Board license. Professor Yeager stated that Coyne in particular was "ill-equipped to handle the rigors of a contact sport (like football) as an athletic trainer on her own regardless of whether she managed to pass [the certification] exam and obtain her state license." *Id.*, *quoting* Affidavit of Shelby Yeager. With regard to Bonisese, Bryan Laurie, who supervised her as a student, rated her performance as "below average/poor" and provided his assessment that she was not qualified to act as an athletic trainer in March of 2010. *Id.*, *citing* Affidavit of Bryan Laurie.

Appellee Resch started playing football at the age of six, and continued playing through high school. *Id.* at 1204-05. Upon graduating from high school in 2008, Resch was accepted at Lackawanna and, hoping to continue playing football, met with Coach Duda prior to arriving for classes. Resch tried out for the Lackawanna football team in the fall of 2008. Resch not only failed to make the roster, but was also placed on academic probation, so he was ineligible to play football in the spring of 2009.

Appellee Feleccia also began playing football as a child at the age of ten, and played through high school. Feleccia was recruited by Coach Duda to play football at Lackawanna. *See id.* Feleccia did not make the team in the fall of 2008, but practiced with them during that time. During a scrimmage in the fall of 2008, Feleccia tore the labrum in his left shoulder, which was surgically repaired. Feleccia was also placed on academic probation after the fall 2008 semester and temporarily withdrew from Lackawanna. *See id.*

In mid-January 2010, Resch and Feleccia returned to Lackawanna for the spring semester with the aspiration to make the football team. *Id.* Lackawanna required

---

[2] Lackawanna did engage a part-time licensed athletic trainer in September 2009, but she did not attend football practices during the 2009-2010 academic year.

appellees to fill out and sign various documents in a "participation packet" before playing with the team, including a "Waiver of Liability and Hold Harmless Agreement" (the Waiver) and a form including an "Information/Emergency Release Consent" (the Consent). *See* Appellees' Brief in Opposition to MSJ at Exhibit 18(b). Appellee Resch "skimmed" and signed the Waiver on March 22, 2010. *Feleccia*, 156 A.3d at 1205. Feleccia also executed the Waiver on March 22, 2010. The Waiver provided as follows:

1. In consideration for my participation in __[Football]_____ (sport), I hereby release, waive, discharge and covenant not to sue Lackawanna College, its trustees, officers, agents, and employees from any and all liability, claims, demands, actions, and causes of action whatsoever arising out of or related to any loss, damage, or injury, including death, that may be sustained by me, or to any property belonging to me, while participating in such athletic activity.

2. To the best of my knowledge, I am not aware of any physical disability or health-related reasons or problems which would preclude or restrict my participation in this activity. I am fully aware of the risks and hazards connected with __[Football]_____ (sport), and I hereby elect to voluntarily participate in said activity, knowing that the activity may be hazardous to me and my property. I voluntarily assume full responsibility for any risks of loss, property damage, or personal injury, including death, that may be sustained by me, or any loss or damage to property owned by me, as a result of being engaged in such activity.

3. I have adequate health insurance necessary to provide for and pay any medical costs that may directly or indirectly result from my participation in this activity. I agree to indemnify and hold harmless Lackawanna College, its trustees, officers, agents, and employees, from any loss, liability, damage or costs, including court costs and attorneys' fees that may be incurred, due to my participation in said activity.

4. It is my express intent that this Release and Hold Harmless Agreement shall bind my family, if I am alive, and my heirs, assigns and personal representative, if I am deceased, and shall be deemed as a release, waiver, discharge and covenant not to sue Lackawanna College, its trustees, officers, agents and employees. I hereby further agree that this Waiver of Liability and Hold Harmless Agreement shall be construed in accordance with the laws of the Commonwealth of Pennsylvania.

In signing this release, I acknowledge and represent that I have read the foregoing Waiver of Liability and Hold Harmless Agreement, understand it and sign it voluntarily; no oral representations, statements, or inducements, apart from the foregoing written agreement, have been made; I am at least eighteen (18) years of age and fully competent; and I execute this Release for full, adequate and complete consideration fully intending to be bound by the same. Parent/Guardians' signature required for individuals under eighteen (18) years of age.

Waiver attached as Exhibit A to Appellants' Answer with New Matter.

Appellees also signed the Consent that provided, in pertinent part, as follows:

(1) I do hereby off[er] my voluntary consent to receive emergency medical services in the event of an injury during an athletic event provided by the athletic trainer, team physician or hospital staff.

Consent attached as part of Exhibit 18(b) to Appellees' Brief in Opposition to MSJ.

On March 29, 2010, appellees participated in the first day of spring contact football practice. The team engaged in a variation of the tackling drill known as the "Oklahoma Drill." Appellees had previously participated in the Oklahoma Drill, or a variation of it, either in high school or at Lackawanna football practices, and were aware the drill would take place during practices. While participating in the drill, both Resch and Feleccia suffered injuries. Resch attempted to make a tackle and suffered a T-7 vertebral fracture. Resch was unable to get up off the ground and Coyne attended to him before he was transported to the hospital in an ambulance. *See Feleccia*, 156 A.3d at 1207. Notwithstanding Resch's injury, the Lackawanna football team continued practicing and running the Oklahoma Drill. Later that same day, Feleccia was injured while attempting to make his first tackle, experiencing a "stinger" in his right shoulder, *i.e.*, experiencing numbness, tingling and a loss of mobility in his right shoulder. *Id.* Bonisese attended Feleccia and cleared him to continue practice "if he was feeling better." *Id.* Feleccia

returned to practice and then suffered a traumatic brachial plexus avulsion while making a tackle with his right shoulder. *Id.*

Appellees filed suit against appellants, Lackawanna, AD Mecca, Coach Duda, Coach Reiss, Coach Lamagna and Coyne and Bonisese, asserting claims for damages caused by negligence, including negligence *per se*. The complaint also sought punitive damages, alleging appellants acted "willfully, wantonly and/or recklessly." Complaint at ¶¶82, 97, 98, 102 & 103. Appellants filed preliminary objections which were overruled, and filed an answer with new matter raising defenses, including that the Waiver precluded liability on all of appellees' claims.

At the close of discovery, appellants filed a motion for summary judgment, relying primarily on the Waiver; appellants argued they were entitled to judgment as a matter of law due to appellees' voluntary release of appellants from any and all liability for damages resulting from participation in the Lackawanna football program. *See* Appellants' Brief in Support of MSJ at 13. In response, appellees argued Lackawanna "ran its Athletic Training Department in a manner demonstrating a total disregard for the safety of its student-athletes or the laws of the Commonwealth of Pennsylvania." Appellees' Brief in Opposition to MSJ at 1. Appellees argued appellants had required appellees to sign the Consent for treatment by an "athletic trainer," thus taking on a duty to provide an athletic trainer, but then failed to provide an athletic trainer for its football team. *See id.* at 18-20.

The trial court granted summary judgment in favor of appellants. The court ruled the Waiver: (1) did not violate public policy; (2) was a contract between Lackawanna and college students relating to their own private affairs, and (3) was not a contract of adhesion. *See Feleccia v. Lackawanna College*, 2016 WL 409711, at *5-*10

(Pa..Com.Pl. Civil Div. Feb. 2, 2016), *citing Chepkevich. v. Hidden Valley Resort, L.P.*, 2 A.3d 1174 (Pa. 2010) (setting forth elements of valid exculpatory agreements).

The court then considered whether the Waiver was enforceable, *i.e.,* whether it "spells out the intention of the parties with particularity and shows the intent to release [Lackawanna] from liability by express stipulation." *Id.* at *10, *quoting Chepkevich,* 2 A.3d at 1191 (additional citations omitted). The court noted the Waiver did not specifically use the word "negligence" or mention the Oklahoma Drill, but it was executed freely by appellees, and stated they were fully aware of the risks and hazards in the activity and "voluntarily assume[d] full responsibility for any . . . personal injury" resulting from it. *Id.* at *11, *quoting* the Waiver. The court found the Waiver immunized appellants from liability because it addressed the "risks and hazards" ordinarily inherent in the sport of football. *Id.* at *12.[3] Finding the negligence claims barred, the court ruled the claim for punitive damages also failed, and discussion of the Waiver's applicability to those allegations was unnecessary. *Id.* at *14 n.13. The court concluded there was no genuine issue of material fact and appellants were entitled to judgment as a matter of law on the basis of the Waiver.

Appellees filed an appeal and the Superior Court reversed.[4] Although the panel agreed with the trial court's holding the Waiver was valid under *Chepkevich*, the panel disagreed that the Waiver barred all of appellees' claims as a matter of law. The panel

---

[3] Quoting 1960s Oregon case law with approval, the court observed: "Body contacts, bruises, and clashes are inherent in the game. There is no other way to play it. Nor [sic] prospective player need be told that a participant in the game of football may sustain injury. That fact is self evident. It draws to the game the manly; they accept its risks, blows, clashes and injuries without whimper." *Id.* at *7, *quoting Vendrell v Sch.Dist. No. 26C, Malheur Cty.* 376 P.2d 406 (Or. 1962).

[4] Judge Shogan authored the opinion, which was joined by P.J.E. Ford Elliott; P.J.E. Stevens, the third judge on the petit panel, did not participate.

first observed the Waiver was "not sufficiently particular and without ambiguity" to relieve appellants of liability for their own acts of negligence. *Feleccia*, 156 A.3d at 1212-13, *quoting Chepkevich*, 2 A.3d at 1189 (exculpatory clause is unenforceable "unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence.").

The panel also held the trial court erred in failing to address appellees' allegations underlying their claim for punitive damages, and whether the Waiver applied to preclude liability based on those allegations. *Id.* at 1213. The panel recognized this Court's jurisprudence holding exculpatory clauses are not enforceable to preclude liability for reckless conduct. *Id.* at 1214, *citing Tayar v. Camelback Skip Corp.*, 47 A.3d 1190 (Pa. 2012).

Finally, the panel's "most important" reason for reversing the trial court's grant of summary judgment was that, after reviewing the record in the light most favorable to appellees as the non-moving parties, there were genuine issues of material fact as to "whether the College's failure to have qualified medical personnel at the March 29, 2010 practice constitute[d] gross negligence or recklessness," and whether that failure caused appellees' injuries or increased their risk of harm. *Id.* at 1214, 1219. The panel's determination in this regard was based on its view that Lackawanna had a "duty of care to its intercollegiate student athletes . . . to have qualified medical personnel available at the football tryout on March 29, 2010, and to provide adequate treatment in the event that an intercollegiate student athlete suffered a medical emergency." *Id.* at 1215. The panel relied in part on *Kleinknecht v. Gettysburg College*, 989 F.2d 1360 (3d Circ. 1993), where the Third Circuit predicted this Court "would hold that a special relationship existed

between the [c]ollege and [student-athlete] that was sufficient to impose a duty of reasonable care on the [c]ollege." *Id.* at 1367. The panel further held it was for a jury to decide whether appellees signed the Waiver "unaware that [Lackawanna's] athletic department did not include qualified athletic trainers." *Feleccia,* 156 A.3d at 1219. Accordingly, the panel remanded the matter for trial.

Upon petition by appellants we granted allowance of appeal to address following issues:

> a. Is a Pennsylvania college required to have qualified medical personnel present at intercollegiate athletic events to satisfy a duty of care to the college's student-athletes?
>
> b. Is an exculpatory clause releasing "any and all liability" signed in connection with participation in intercollegiate football enforceable as to negligence?

*Feleccia v. Lackawanna College*, 175 A.3d 221 (Pa. 2017) (*per curiam).*

This matter presents pure questions of law, over which our standard of review is *de novo* and our scope of review is plenary. *See In re Vencil*, 638 A.3d 1, 11-12 (Pa. 2017). "[A]n appellate court may reverse the entry of summary judgment only where it finds that the trial court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to [a] judgment as a matter of law." *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1004 (Pa. 2003), *citing Pappas v. Asbel*, 768 A.2d 1089 (Pa. 2001). We consider the parties' arguments with these standards in mind.

**II.**

**A. Is a Pennsylvania college required to have qualified medical personnel present at intercollegiate athletic events to satisfy a duty of care to the college's student-athletes?**

Appellants argue the Superior Court created a brand new common law duty of care requiring colleges to have qualified medical personnel available to render treatment at every practice and every game. Appellants aver the Superior Court did so without attempting to analyze the factors set forth in *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000) (before recognizing new duty of care courts must analyze the relationship between the parties; the social utility of the actor's conduct; the nature of the risk imposed and foreseeability of the harm incurred; the consequences of imposing a duty upon the actor; and the overall public interest in the proposed solution). Appellants' Brief at 18-20, *citing Feleccia*, 156 A.3d at 1215. Appellants assert that, in creating this new duty of care, the Superior Court relied only on a decades-old, non-binding federal decision. *Id., citing Kleinknecht*, 989 at 1371. Appellants argue that, had the Superior Court applied the *Althaus* factors instead, it would not have created such a duty. Appellants' Brief at 20-22. Appellants argue a proper analysis of these factors either weighs against the creation of a new duty or is neutral. Accordingly, appellants request we reverse the Superior Court's decision to the extent it created a new duty.[5]

Appellees respond that the panel did not create a new, onerous duty, and that appellants actually failed to comply with existing common law and statutory duties to have

---

[5] The Association of Independent Colleges and Universities of Pennsylvania (AICUP) filed an *Amicus Curiae* Brief in support of appellants. AICUP notes there is no concrete and substantial justification for the Superior Court's imposition of a new affirmative duty to have qualified medical personnel physically present at all practices for all collegiate sports. *See* AICUP's Brief at 5-6, *citing Seebold v. Prison Health Servs.,* 57 A.3d 1232, 1245 (Pa. 2012). AICUP further notes there is not a "full and balanced" record upon which to base a new duty. *Id.* at 6.

qualified medical personnel available at intercollegiate athletic events. Appellees refer to MPA provisions that set forth the qualifications for an "athletic trainer" and the manner in which they must perform their duties. Specifically, appellees note the regulations implementing the MPA establish restrictions and protocols for licensed athletic trainers, and they also prohibit the use of the title "athletic trainer" by any person without a Board-issued license. *See* Appellees' Brief at 29-30, *quoting* 63 P.S. §422.51a ("An athletic trainer who meets the requirements of this section shall be licensed, may use the title 'athletic trainer' . . . and may perform athletic training services. A person who is not licensed under this section may not use the designation of licensed athletic trainer, athletic trainer or any of the listed abbreviations for that title, including 'L.A.T.' or 'A.T.L.,' or any similar designation."). Appellees thus argue the Superior Court's holding recognizes appellants have a duty to provide athletic trainers at practices, who, by statute, should be qualified medical personnel. Appellees' Brief at 31.

Appellees also submit appellants' claim the Superior Court ignored the *Althaus* factors is disingenuous. Appellees note the panel explicitly relied on *Kleinknecht* and, although the federal decision predated *Althaus*, the Third Circuit considered the same factors ultimately set forth in *Althaus*. Appellees' Brief at 39-40, *citing Feleccia*, 156 A.3d at 1215 (*Kleinknecht* court recognized: special relationship between college and student-athlete requiring college to act with reasonable care towards athletes; risk of severe injuries during athletic activities was foreseeable; and college acted unreasonably in failing to protect against risk). In any event, appellees reiterate, the Superior Court did not create a new common law duty, but rather recognized the "duty of care is necessarily

rooted in often amorphous public policy considerations[.]" Appellees' Brief at 38, *quoting Althaus*, 756 A.2d at 1169.

Finally, appellees observe appellants themselves undertook the duty to protect their student-athletes by customarily hiring licensed athletic trainers prior to 2009, and holding out Coyne and Bonisese as "athletic trainers" in the documentation regarding their employment, including executed job descriptions, where Coyne and Bonisese acknowledged they were required to have passed the national certification exam, which is a pre-requisite to use of the title "athletic trainer." *See* Appellees' Brief at 41-43, *quoting* Rstmt (2d) of Torts, §323 ("One who undertakes . . . to render services to another . . . is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking[.]"). Appellees argue the evidence presented was sufficient to raise factual jury questions regarding whether appellants breached this duty and whether that breach led to appellees' injuries.[6]

---

[6] The Pennsylvania Association for Justice (PAJ) and The National Athletic Trainers' Association and Pennsylvania Athletic Trainer's Society, Inc. (Athletic Trainers) filed *Amicus Curiae* briefs in support of appellees. PAJ argues appellant undertook an obligation to provide athletic trainers for its student athletes participating in the football program, then recklessly provided unqualified personnel and failed to advise the student athletes it was not providing licensed athletic trainers. PAJ further notes Coyne and Bonisese falsely held themselves out to be athletic trainers, and this false representation was propagated by the coaching staff such that the student athletes reasonably relied on the misrepresentations. PAJ submits these actions by appellants were reckless, and the Waiver is unenforceable against reckless conduct. *See* PAJ's Brief at 11-12, *citing Tayar*.

The Athletic Trainers similarly seek affirmance of the Superior Court's decision and caution a failure to have licensed athletic trainers at practices would encourage unsafe practices, resulting in an increase in the frequency and severity of injuries to student-athletes. The Athletic Trainers note the Superior Court's decision does not impose a new standard on colleges, but rather follows basic, general practices for preventing and treating student athletic injuries. The Athletic Trainers submit it is common sense that a college or university's failure to adhere to established professional standards could violate a duty of care owed to its student-athletes. *Id.* at 15-16.

Having considered the parties' arguments and the opinion below, we acknowledge the Superior Court articulated a duty not previously recognized by Pennsylvania Courts: a college has a "duty of care to its intercollegiate student athletes requir[ing] it to have qualified medical personnel available at [athletic events, including] the football tryout, . . . and to provide adequate treatment in the event that an intercollegiate student athlete suffer[s] a medical emergency." *Feleccia*, 156 A.3d at 1215, *citing Kleinknecht*, 989 F.2d at 1369-70. We further recognize the Superior Court did not analyze the *Althaus* factors, as required when imposing a previously unarticulated common law duty. *Althaus*, 756 A.2d at 1169. Instead, the panel relied on non-binding federal case law to impose what it viewed as a new common law duty. In this specific regard, the panel erred.

Courts should not enter into the creation of new common law duties lightly because "the adjudicatory process does not translate readily into the field of broad-scale policymaking." *Lance v. Wyeth*, 85 A.3d 434, 454 (Pa. 2014), *citing Seebold*, 57 A.3d at 1245; *see also Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 333 (Pa. 2010) ("Unlike the legislative process, the adjudicatory process is structured to cast a narrow focus on matters framed by litigants before the Court in a highly directed fashion"). We also acknowledge it "is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations." *Seebold,* 57 A.3d at 1245 & n.19 (additional citations omitted). "[T]he Court has previously adopted the default position that, unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, we will not impose new affirmative duties." *Id.* at 1245 (citations omitted).

Applying the *Althaus* factors is not a mere formality, but is necessary when courts announce a new common law duty. *Althaus* requires consideration of the justifications for and the relevant consequences and policy concerns of the new duty of care. *See Althaus*, 756 A.2d at 1169 (setting forth factors for determination of new common law duty). Further, "determining whether to impose a duty often requires us to weigh 'amorphous public policy considerations, which may include our perception of history, morals, justice and society.'" *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 223 (Pa. 2018), *quoting Althaus*, 756 A.2d at 1169 (additional citations omitted). The Superior Court did not engage these factors, nor did the summary judgment record include relevant data regarding, for example, injury rates at practices, the consequences of having (or not having) available qualified medical professionals, the budgetary or other collegiate resource impact, or the relative public policy concerns involved.[7]

---

[7] Even a cursory review of the *Amici* briefs here reveals a multitude of items that might be considered in such an analysis. *See, e.g.,* Athletic Trainers' Brief at 16-20 (discussing National Athletic Trainers Association (NATA) Recommendations and Guidelines); AICUP Brief at 7-14 (discussing Superior Court's failure to consider "injury rates, treatment data existing health care delivery systems, the costs of employing additional medical staff, or the degree of improvement (if any) of medical outcomes for injuries sustained on the practice field.").

Justice Wecht criticizes our decision not to engage in an *Althaus* analysis, and asserts the "principles of tort law require us to go farther." *See* Concurring and Dissenting Opinion (Wecht, J.) at 2, 20. We respectfully disagree with our learned colleague's approach which would lead to the creation of a new duty under *Althaus* as it is unnecessary here, and thus contradicts our traditional reluctance to announce new common law duties. *See Walters,* 187 A.3d at 223 ("Our concern for the hazards of judicial policy-making has prompted our continuing restraint."). Restraint is particularly warranted here where the parties did not argue *Althaus* below, the courts did not consider it, and the advocacy in this Court is limited. *Cf. Id.* (recognizing *Althaus* analysis should be conducted with caution and with acknowledgment of lower court's findings and parties' arguments regarding *Althaus* analysis).

Importantly, however, an *Althaus* analysis was not necessary here because our review reveals the present circumstances involve application of existing statutory and common law duties of care. *See, e.g., Dittman v. UPMC*, 196 A.3d 1036, 1038 (Pa. 2018) (analysis of *Althaus* factors not required where case is one involving "application of an existing duty to a novel factual scenario"). In *Dittman*, for example, we recognized the legal duty of an employer (UPMC) "to exercise reasonable care to safeguard its employees' sensitive personal information stored by the employer on an internet-accessible computer system." *Id.* at 1038. We did so because UPMC had required its employees to provide sensitive personal information, and then collected and stored that information on its computer system without implementing adequate security measures, such as encryption, firewalls, or authentication protocols. *Id.* at 1047. We reasoned that this "affirmative conduct" by UPMC created the risk of a data breach, which in fact occurred. *Id.* We further determined that, in collecting and storing its employees' data on its computers, UPMC owed those employees a duty to "exercise reasonable care to protect them against an unreasonable risk of harm arising out of that act." *Id.* *Dittman* may have been our first opportunity to recognize this duty in the context of computer systems security, but there is longstanding jurisprudence holding that "[i]n scenarios involving an actor's affirmative conduct, he is generally 'under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act.'" *Id.* at 1046*, quoting Seebold,* 57 A.3d at 1246. This existing duty "appropriately undergirds the vast expanse of tort claims in which a defendant's affirmative, risk-causing conduct is in issue." *Id.* at 1047, *quoting Seebold,* 57 A.3d at 1246*, see also Dittman*, 796 A.3d at 1056-57 (Saylor, CJ, concurring and dissenting)

(requirement to provide confidential information as condition of employment created "special relationship" between employer and employees giving rise to duty of reasonable care to protect information against foreseeable harm).

Additionally, we have adopted as an accurate statement of Pennsylvania law the Restatement (Second) of Torts §323 (1965). *Gradel v. Inouye*, 421 A.2d 674, 677-78 (Pa. 1980) ("Section 323(a) of the Restatement of Torts has been part of the law of Pennsylvania for many years."). Section 323 provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement. (Second) of Torts, §323 (1965). *See also Feld v Merriam*, 485 A.2d 742, 746 (Pa. 1984) (landlord that undertook duty to provide secured parking for tenants may be liable for damages arising from failure to exercise reasonable care in doing so).

In *Feld*, the plaintiffs were injured during a carjacking that began inside the garage of their apartment building. They filed a negligence lawsuit against their landlord, who had charged tenants additional rental fees to provide a gate and security guard for its parking garages. In discussing the viability of the plaintiffs' negligence action, the *Feld* Court first noted landlords do not generally owe a duty as insurer to protect the safety of their tenants. However, the Court noted such a duty might arise if the landlord undertook to provide secured parking and failed to exercise reasonable care in doing so, and the

tenants, who had relied on those services, were injured as a result. *Id.* at 746, *citing* Restatement (Second) of Torts, §323 (1965) (identifying discrete duty where a "landlord [who] by agreement or voluntarily offers a program to protect the premises, . . . must perform the task in a reasonable manner and where a harm follows a reasonable expectation of that harm, he is liable.").

Application of these legal principles to the present factual scenario supports a determination that "affirmative conduct" by appellants created a "special relationship" with and increased risk of harm to its student athletes such that appellants had a duty to "exercise reasonable care to protect them against an unreasonable risk of harm arising" from that affirmative conduct. *Dittman, supra.* In addition, the record supports a finding appellants undertook a duty to provide duly licensed athletic trainers for the purpose of rendering treatment to its student athletes participating in athletic events, including the football practice on March 29, 2010,[8] although it remains to be determined whether the steps actually taken by appellants satisfied that duty. *See Wilson v. PECO Energy Co.*,

---

[8] The Chief Justice challenges whether appellants undertook a duty to "provide" athletic trainers at the March 29, 2010 practice, and submits appellants were required only to "have qualified medical personnel **available**." Concurring and Dissenting Op. at 2-3, n.1 (emphasis added). The Chief Justice offers this distinction is material with respect to the duty at issue because the consent, upon which the duty is derived, is phrased in the disjunctive, and appellees received treatment by the team physician and hospital staff, potentially in accordance with the consent. *Id., citing* Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 5, *reprinted* in R.R. 4197a (medical services to be provided by "athletic trainer, team physician or hospital staff"). Although this particular distinction may be further elucidated at trial, we emphasize the consent expressly stipulates medical services "during an athletic event" will be "**provided** by the athletic trainer, team physician or hospital staff." Consent, *supra*. (emphasis added). Appellant thus stated it would "provide" medical treatment during the March 29, 2010 practice. Whether appellants breached that obligation by having Coyne and Bonisese as the only "athletic trainers" at the practice, or met that duty by having appellees treated by the team physician and hospital staff following the practice, is a question for the jury on remand.

61 A.3d 229, 233 (Pa. Super. 2012) (sufficient facts alleged to overcome summary judgment and reach jury on question of scope of duty undertaken and its breach).

Specifically, when we consider the record in the light most favorable to appellees as the non-moving parties, we observe the following: before hiring Coyne and Bonisese, Lackawanna customarily employed athletic trainers, who were licensed as required by applicable statutes and regulations; Lackawanna required its student athletes including appellees to execute the Consent to treatment by "athletic trainer, team physician or hospital staff" in the event of an emergency during participation in the football program; Lackawanna held out Coyne and Bonisese as athletic trainers to appellees and their teammates, despite its knowledge they lacked the statutorily required licenses; Lackawanna demonstrated its awareness that Coyne and Bonisese did not have the qualifications of athletic trainers by renaming them "first responders," but did not alter their job descriptions, which encompassed the duties of "athletic trainers"; Coyne and Bonisese were the only individuals present at the March 29, 2010 football tryout to provide treatment to injured student athletes; the coaching staff propagated the misrepresentation of Coyne and Bonisese as athletic trainers; and Coyne and Bonisese performed the role of athletic trainers by attending appellees when they were injured, and directing appellee Feleccia to return to practice when he was "feeling better."

Under these circumstances, appellants clearly created an expectation on which the student athletes might reasonably rely — *i.e.* in the case of injury during an athletic event, they receive treatment from a certified athletic trainer, as clearly outlined in the Consent they were required to sign. We thus easily conclude appellants undertook a duty to provide treatment by a certified athletic trainer at the March 29, 2010 practice. We

further conclude the record, taken in the light most favorable to appellees, demonstrates the existence of a genuine issue of material fact sufficient to overcome summary judgment regarding whether appellants breached this duty and caused appellees' injuries. Thus, we hold the trial court erred in entering summary judgment in favor of appellants.

## B. Is the Waiver enforceable as to the negligence claims?

Notwithstanding the existence of a duty on the part of appellants, and factual allegations of a breach of that duty which would support a negligence claim, we must now consider whether the Waiver completely precludes any liability on such a claim, or on appellees' additional claims of gross negligence and recklessness. Appellants observe that by signing the Waiver appellees released "any and all liability, claims, demands, actions and causes of action whatsoever arising out of or related to any loss, damage, or injury, including death, that may be sustained" while playing football at Lackawanna. Appellants' Brief at 38. Appellants submit *Topp Copy Prod., Inc. v. Singletary*, 626 A.2d 98, 100 (Pa. 1993) held a Waiver of "any and all" liability was sufficiently clear to bar claims of all negligence, and the Superior Court erred in holding the Waiver is unenforceable because "it does not indicate that Lackawanna was being relieved of liability for its own acts of negligence." Appellants' Brief at 39, *quoting Topp Copy*, 626 A.2d at 100 ("[T]he word 'all' needs no definition; it includes everything and excludes nothing. There is no more comprehensive word in the language, and as used here it is obviously broad enough to cover liability for negligence.") (additional citations omitted). Appellants emphasize "Pennsylvania courts have consistently held that exculpatory clauses may bar suits based on negligence even where the language of the clause does

not specifically mention negligence at all." Appellants' Brief at 43, *quoting Chepkevich,* 2 A.3d at 1193 (emphasis added).

Appellees submit the only issue preserved by appellants with respect to the validity of the Waiver is whether it is enforceable as to negligence, and that in this regard, the Superior Court correctly determined the Waiver is not sufficiently explicit regarding appellants' own negligence to be enforceable. Appellees further assert the law is clear the Waiver is not enforceable to protect appellants from liability arising from gross negligence or recklessness, and the Superior Court properly remanded for further proceedings to determine whether appellants' conduct constituted gross negligence or recklessness. Appellees' Brief at 45-46, *citing Tayar, supra*, and *Chepkevich*, *supra.*

At the outset, we note appellants concede, as they must, that appellees' claims of liability arising from recklessness are not precluded by the Waiver. *See, e.g. Tayar*, 47 A.3d at 1203 (finding public policy prohibits pre-injury waivers from releasing reckless behavior). The issue before us is thus narrowed to whether the Waiver, which purports to release "any and all liability," precludes liability on appellees' claims of negligence and, relatedly, gross negligence.[9] We bear in mind that exculpatory contracts are generally

---

[9] As discussed in further detail *infra*, gross negligence is a rather amorphous concept — to the extent it is separate from ordinary negligence and recklessness, it appears to lie somewhere between the two. The parties have consistently referred to negligence, gross negligence and recklessness throughout this litigation, and the complaint included allegations of negligence and reckless conduct, the latter couched within the punitive damages claim. As noted, the trial court did not make pertinent rulings. *Feleccia*, 2016 WL 409711, at *14 n.13 (where Waiver bars negligence, claim for punitive damages necessarily fails). The Superior Court affirmatively held the record in this case supports a finding of "gross negligence or recklessness, the latter of which, pursuant to *Tayar*, cannot be waived in a pre-injury exculpatory release." *Feleccia*, 156 A.3d at 1214. Accordingly, the parties have presented arguments regarding the Waiver's enforceability against claims of gross negligence, which was not decided in *Tayar*. *See, e.g.,*

disfavored, and subject to close scrutiny. *See Employers Liability Assur. Corp. v. Greenville Bus. Men's Ass'n*, 224 A.2d 620, 623 (Pa. 1966) ("contracts providing for immunity from liability for negligence must be construed strictly since they are not favorites of the law"); *see also Tayar,* 47 A.3d at 1199. Accordingly, exculpatory contracts are valid and enforceable only when "certain criteria are met." *Tayar*, 47 A.3d at 1200 & n.8, *citing Chepkevich* and *Topp Copy*. Our case law provides "guiding standards" for assessing the enforceability of exculpatory contracts. *See, e.g., Topp Copy,* 626 A.2d at 99 (1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing the immunity is upon the party invoking protection under the clause).

### i. Ordinary Negligence

The Superior Court considered the Waiver to be unenforceable as to appellees' claims of negligence because its "language does not indicate that Lackawanna was being relieved of liability for its own acts of negligence." *Feleccia*, 156 A.3d at 1213. The court further found fault with the Waiver because it did not specifically include the word

---

Appellants' Brief at 46-52 (waiver of "any and all" liability is enforceable against gross negligence claims); Appellee's Brief at 46-54 (waiver cannot be used as shield against gross negligence claims, which encompasses more egregious conduct than ordinary negligence). Therefore, unlike *Tayar,* 47 A.3d at 1199 n.7, we reach the question here.

"negligence." *Id.* at 1212-13. Although our cases have directed that exculpatory clauses must clearly provide "a person is being relieved of liability for his own acts of negligence[,]" we have not prescribed specific language. *Chepkevich*, 2 A.3d at 1189, *quoting Topp Copy*, 626 A.2d at 99. In this case, the Waiver purported to protect appellants from "any and all liability" arising out of "any injury" sustained by student athletes while playing football at Lackawanna. We have determined such language is sufficient to express the parties' intention to bar ordinary negligence claims. *See Topp Copy*, 626 A.2d at 99, 101 (lease agreement releasing lessor from '"any and all liability" clearly and unambiguously covered negligence claims'); *see also Cannon v. Bresch*, 160 A. 595, 596 (Pa. 1932) (lease releasing landlord from "all liability" was sufficient to cover liability for negligence).

The Superior Court, in reaching the opposite result, failed to acknowledge the trial court did not find the mere existence of the Waiver automatically extinguished all potential claims of liability. Rather, the trial court applied the *Topp Copy* guiding standards to determine "whether the [exculpatory] clause 'spells out the intention of the parties with particularity and shows the intent to release [appellants] from liability by express stipulation.'" Trial Court op. at 19, *quoting McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 121 (Pa. Super. 2015), *quoting Chepkevich*, 2 A.3d at 1191. The trial court examined the facts of record, including the parties' intentions related to the execution of the Waiver as well as whether the risks undertaken by appellees and injuries suffered were encompassed within its terms. Trial Court op. at 18-22. The trial court determined it could not "say that the risks associated with Lackawanna's Oklahoma Drill are so far beyond those risks ordinarily inherent to the sport of football and addressed in the Waiver as 'risks and hazards' typical of the sport that we must, as a matter of law, invalidate the

Waiver." *Id.* at 21-22. The trial court thus found the Waiver was enforceable and entered summary judgment in favor of appellants. We conclude that the Superior Court's reversal of this holding with respect to appellees' claims of ordinary negligence was error.[10] *See, e.g., Chepkevich*, 2 A.3d at 1194-95 (release enforceable to preclude liability for general claims of negligence); *see also, Topp Copy*, 626 A.2d at 101 (release of "any and all" liability sufficient to preclude liability resulting from landlord's negligence); *see also Cannon*, 160 A. at 597 ("The covenant in this lease against liability for acts of negligence does not contravene any policy of the law.").

### ii. Gross Negligence

As we have seen, appellees' claims of ordinary negligence are barred by the Waiver, their claims of recklessness are not, and the allegations of recklessness will be tested at trial on remand. We have yet to rule on whether appellees may also proceed to trial on their allegations of gross negligence, or whether such claims are precluded by the Waiver. *See Tayar*, 47 A.3d at 1199 n.7 ("[A]s gross negligence is not implicated in the instant matter, we leave for another day the question of whether a release for gross negligence can withstand a public policy challenge.").

---

[10] The Superior Court also found appellees' allegations that appellants violated applicable statutory licensing requirements and these violations constituted negligence *per se* should be remanded for trial. *Feleccia*, 156 A.3d at 1217. In their brief to this Court, appellants recognize "negligence *per se* is simply a variant of ordinary negligence." *See* Appellants' Reply Brief, at 17, *quoting Echeverria v Holley*, 142 A.3d 29, 37-38 (Pa. Super. 2016) (additional citations omitted). To the extent appellants' conduct constituted ordinary negligence, either through a breach of duty or through failure to comply with statutory requirements, the Waiver is enforceable to bar liability for such claims.

Appellants consider gross negligence to be more closely aligned with negligence than recklessness, describing it as a form of negligence where there is a more significant departure from the standard of care, but without the "conscious action or inaction" that characterizes recklessness. *See* Appellants' Brief at 52. Appellants view gross negligence as a type of negligence that is covered by the Waiver and precludes appellees' action for damages. *Id.* at 53-54.

Appellees respond that gross negligence is "more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference. . . . The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." Appellees' Brief at 50, *quoting Bloom v. Dubois Reg'l Med. Ctr.,* 597 A.2d 671, 679 (Pa. Super. 1991); *accord Albright v. Abington Mem'l Hosp.,* 696 A.2d 1159, 1164 (Pa. 1997) ("We believe that this definition is a clear, reasonable, and workable definition of gross negligence[.]"). Here, appellees assert, there were sufficient facts presented for the jury to conclude appellants' conduct was grossly negligent, and public policy compels the conclusion such conduct should not be immunized by the Waiver. Appellees' Brief at 52-53.

A determination that a contract is unenforceable because it contravenes public policy "requires a showing of overriding public policy from legal precedents, governmental practice, or obvious ethical or moral standards." *See Tayar*, 47 A.3d at 1199, *citing Williams v. GEICO Gov't Employees Ins. Co.,* 32 A.3d 1195, 1200 (Pa. 2011). "It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. . . ." *Id., quoting Williams*, 32 A.3d at

1200. Our law is clear that pre-injury exculpatory contracts purporting to protect a party from liability arising from recklessness are unenforceable on this public policy basis.

Although we have equated "gross negligence" with "recklessness" in the criminal law context, we have not expressly applied that equation in the civil context. *See Com. v. Huggins*, 836 A.2d 862, 867 (Pa. 2003) (gross negligence equates with recklessness for purpose of establishing *mens rea* for manslaughter). In the civil context, there is some difficulty in ascertaining the term's precise meaning. *See In re Scheidmantel*, 868 A.2d 464, 484-85 (Pa. Super. 2005) (recognizing "gross negligence" is frequently invoked but is not well defined in the civil context and "Pennsylvania Courts have struggled to provide a workable definition for 'gross negligence' when faced with the need to apply the concept."). In *Albright*, 696 A.2d at 1164, we defined gross negligence in the context of the Mental Health Procedures Act[11] as a "form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." *Id.* at 1164, *quoting Bloom*, 597 A.2d at 679.

Thus, although we have not previously settled on a definitive meaning of the term "gross negligence" as compared to "ordinary negligence" in the civil context, we have recognized there is a difference between the two concepts, and they are distinguished by the degree of deviation from the standard of care. *See, e.g., Albright, supra*; *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 703 (Pa. Super. 2000), *appeal denied*, 785 A.2d 90 (Pa. 2001). *See also* Pa. Suggested Standard Civil Jury Instructions 13.50

---

[11] 50 P.S. §7101-7503. The public policy rationale underlying the Mental Health Procedures Act policy is to assure availability of adequate treatment to mentally ill persons, and the Act provides procedures to effectuate that policy. 50 P.S. §7102.

("Gross negligence is significantly worse than ordinary negligence" requiring proof actor "significantly departed from how a reasonably careful person would act under the circumstances"). To the extent our courts have used the term, the "general consensus finds gross negligence constitutes conduct more egregious than ordinary negligence but does not rise to the level of intentional indifference to the consequences of one's acts." *Id.* Other Pennsylvania sources have observed:

> In essence, gross negligence is merely negligence with a vituperative epithet. It constitutes conduct more egregious than ordinary negligence but does not rise to the level of intentional indifference to the consequences of one's acts. It may also be deemed to be a lack of slight diligence or care comprising a conscious, voluntary act or omission in reckless disregard of a legal duty and the consequences to another party. The term has also been found to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.

2 Summ. Pa. Jur. 2d Torts §20:5 (internal citations omitted).

Gross negligence has thus been consistently recognized as involving something more than ordinary negligence, and is generally described as "want of even scant care" and an "extreme departure" from ordinary care. *Royal Indem. Co. v. Sec. Guards, Inc.*, 255 F.Supp.2d 497, 505 (E.D. Pa. 2003), *quoting Williams v. State Civil Serv. Comm'n*, 306 A.2d 419, 422 (Pa. Cmwlth. 1973), *aff'd* 327 A.2d 70 (Pa. 1974); *see also Scheidmantel*, 868 A.2d at 485 (gross negligence is "a lack of slight diligence or care comprising a conscious, voluntary act or omission in 'reckless disregard' of a legal duty and the consequences to another party"). *See also* Black's Law Dictionary 1057 (7th ed. 1999) (gross negligence is a "lack of slight diligence or care" and a "conscious, voluntary act or omission in reckless disregard of a legal duty and the consequences to another

party"). With these principles in mind, we now proceed to consider whether a pre-injury exculpatory waiver is valid to preclude claims of gross negligence.[12]

In *Tayar*, we held an exculpatory clause was not valid to preclude liability arising from reckless conduct because allowing such waivers would permit parties to "escape liability for consciously disregarding substantial risks of harm to others[.]" *Tayar*, 47 A.3d at 1203. We recognized such pre-injury releases are unenforceable in circumstances where they "would jeopardize the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct." *Id.*

As we have seen, gross negligence does not rise to the level of the intentional indifference or "conscious disregard" of risks that defines recklessness, but it is defined as an "extreme departure" from the standard of care, beyond that required to establish ordinary negligence, and is the failure to exercise even "scant care." *Royal Indem. Co.*, 255 F.Supp.2d at 505. *See also* 2 DAN B. DOBBS, THE LAW OF TORTS § 140 (gross negligence is "a high, though unspecified degree of negligence, or as courts sometimes say, the failure to use even slight care.") Thus, gross negligence involves more than a

---

[12]Chief Justice Saylor articulates a concern that common pleas courts will have difficulty deciding when challenged action rises to the level of gross negligence in order to determine the applicability of an exculpatory agreement. *See* Concurring and Dissenting Op. at 7 (Saylor, C.J.). We observe, however, that courts of common pleas are routinely charged with determining when conduct reaches the level of gross negligence. In fact, we have recognized the question of "whether an act or failure to act constitutes gross negligence is for a jury, but may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find gross negligence." *Albright*, 696 A.2d at 1165 (emphasis omitted). We further note juries may be aided in their consideration of the concept with a specifically tailored jury instruction. *See* Pa. Suggested Standard Civil Jury Instructions 13.50 ("Gross negligence is significantly worse than ordinary negligence" requiring proof that actor "significantly departed from how a reasonably careful person would act under the circumstances").

simple breach of the standard of care (which would establish ordinary negligence), and instead describes a "flagrant" or "gross deviation" from that standard. *Bloom*, 597 A.2d at 679 (gross negligence involves behavior that is "flagrant, grossly deviating from the ordinary standard of care"). As such, the same policy concerns that prohibit the application of a waiver in cases of recklessness — *i.e.*, allowing it would incentivize conduct that jeopardizes the signer's health, safety and welfare to an unacceptable degree requires a similar holding with regard to gross negligence.[13] Accordingly, we hold the Waiver is not enforceable to preclude liability arising from appellees' claims of gross negligence, and the allegations supporting such claims should be tested at trial on remand.

## III. Conclusion

For all the foregoing reasons, we hold appellants had a duty to provide duly licensed athletic trainers for the purpose of rendering treatment to its student athletes participating in athletic events, including the football practice of March 29, 2010, and there is a genuine issue of material fact regarding whether appellants breached this duty. Moreover, although the Waiver bars recovery for appellees' damages arising from ordinary negligence, we hold the Waiver does not bar recovery for damages arising from

---

[13] We reach this conclusion notwithstanding our recognition that gross negligence does not involve the "conscious" disregard of risks that defines recklessness. *Compare* Pa. Suggested Standard Civil Jury Instructions 13.60 ("Reckless conduct is significantly worse than negligent conduct" requiring proof that actor "intentionally acted or failed to act in conscious disregard of the likelihood of harm to others") *with* Pa. Suggested Standard Civil Jury Instructions 13.50 ("Gross negligence is significantly worse than ordinary negligence" requiring proof that actor "significantly departed from how a reasonably careful person would act under the circumstances").

gross negligence or recklessness, and there remain factual questions regarding whether appellants' conduct constituted gross negligence or recklessness. Accordingly, we affirm the Superior Court's order only to the extent it vacated the trial court's entry of summary judgment on these claims specifically, and we remand this matter to the trial court for further proceedings consistent with this opinion.

Jurisdiction relinquished.

Justices Baer, Todd, Donohue and Mundy join the opinion.

Chief Justice Saylor and Justice Wecht file concurring and dissenting opinions.